# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2528 | **DATE** | 7/25/2003 |
| **CASE TITLE** | UNITED STATES vs. UPM-KYMMENE OYJ, ET AL | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  **Enter memorandum opinion and order enjoining the proposed merger as violative of the Clayton Act.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | JUL 2 9 2003 | | 82 |
| ✓ | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | | G. Y | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | | |
| DW | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

UPM-KYMMENE OYJ, *et al.*,

    Defendants.

No. 03 C 2528
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Defendant UPM-Kymmene Oyj ("UPM"), parent company to Raflatac, a seller of label

stock, intends to buy Morgan Adhesive Company ("MACtac"), another seller of label stock, for

$425 million. This will leave Raflatac and fellow label stock seller Avery Dennison ("Avery")

with about 70% of the sales of certain kinds of label stock (Avery itself has about half the sales at

present). The United States ("the Government") seeks to prevent this sale, arguing that the merger

will result in anti-competitive consequences.

## 1.

### The Agreed Facts

### I.    BACKGROUND

#### A.    The Transaction

1.    On August 20, 2002, UPM agreed to purchase MACtac from Bemis for $420

million. (GX 328 at 67; DX 1523 at 8).

82

2. The closing of the UPM-Bemis transaction was to occur as soon as the parties obtained the European Commission's approval and U.S. Hart-Scott-Rodino clearance, but not earlier than November 15, 2002. There were no significant conditions to closing other than the European and American merger clearances. (DX 1482; GX 328 at 67).

3. The European Commission approved the transaction on October 16, 2002. (DX 1482; GX 328 at 67; DX 1473 (European Commission decision approving the Raflatac/MACtac merger)).

4. Raflatac, Inc. ("Raflatac") and MACtac produce pressure-sensitive labelstock, and such labelstock is sold primarily to companies called label "converters" for use in making self-adhesive, or pressure-sensitive, labels for a broad range of consumer and commercial labeling applications. (GX 385 at 2; DX 2262 (Harris Rep.) at 19-20).

5. Bemis is a corporation organized and existing under the laws of Missouri. (GX 328 at 77). Bemis is engaged in two lines of business: the production and sale of pressure-sensitive materials, through its MACtac subsidiary; and the production and sale of flexible packaging products, conducted through other Bemis operations. (DX 1468 at 2-6). In 2002, Bemis reported total worldwide revenues of over $2.4 billion. (DX 1003 at 3).

6. MACtac, a wholly owned Bemis subsidiary, is organized and existing under the laws of Ohio. (GX 328 at 77).

7. In 2002, MACtac had total worldwide sales of *[TRADE SECRET UNDER SEAL]*. (DX 1003 at 7).

2

8.      In North America, MACtac operates several labelstock production plants and had total labelstock sales of about *[TRADE SECRET UNDER SEAL]* in 2002.  (GX 328 at 8-9, 26; DX 1468 at 7).  In the United States, MACtac owns and operates labelstock production facilities in Pennsylvania, Nevada, Indiana, and Ohio.  (GX 328 at 8-9, 26; DX 1468 at 7).

9.      UPM is a corporation organized and existing under the laws of Finland and is one of the world's largest producers of forestry and paper products.  In 2002, UPM reported total worldwide revenues of over $10 billion.  (DX 1523 at 10).

10.      In 2002, Raflatac had North American labelstock sales of about $118 million. (O'Connell Tr. 1158:1-2).

11.      Raflatac and MACtac produce labelstock and sell labelstock primarily to label converters.  (DX 2262 (Harris Rep.) at 19-20).

**B.      Description of the Labeling Industry**

12.      Pressure-sensitive labels ("PSL") are peeled off a base material and applied to surfaces.  (GX 385 at 2).

13.      Generally, labelstock used to make the labels is produced in large rolls of a multi-layer laminate consisting of a face material (the surface of the label on which information and/or decoration is printed); an adhesive (which fixes the label to the surface); a silicon layer or coating (which allows an easy release of the face material from the base material); and the base material (also called "release," which protects the adhesive).  (GX 278 at REI 00076; GX 385 at 2).

3

14.     Labelstock is produced with paper, synthetic (plastic) film, or other types of materials as the face material, and various types of permanent or removable adhesives may be used. (DX 1468 at 5).

15.     Pressure-sensitive labelstock is produced with coating machines (or "coaters"). (DX 2053 (Panozzo Decl., 3/28/03, at ¶ 3)).

16.     Converters make pressure-sensitive labels from labelstock by cutting it to desired sizes and shapes and adding printed text as needed by their customers. (GX 385 at 2).

17.     The conversion process generally consists of cutting labels according to customer specification. (DX 2262 (Harris Rep.) at 19-20, ¶ 37). To make labels, converters cut labelstock to the sizes desired by their end-user customers, and depending on the end-use application, may also print information or images on the labels. (GX 385 (Schwartz Rep.) at 2). The labels are peeled off the release liner and then applied to various surfaces by pressure. (GX 385 (Schwartz Rep.) at 2).

18.     Most labelstock production is converted into labels used for one of two general purposes—"variable information printing" (or "VIP") and "prime." (GX 385 at 2).

19.     Labelstock is sold primarily to converters who use it to make labels for their end-user customers. (GX 385 at 2).

20.     There are about 2,000 converters of PSL in the United States. (O'Connell Dep. at 81:14-16).

21.     Both paper and film labelstock are used in prime and VIP labeling applications. (GX 385 at 2).

## II. INDUSTRY PARTICIPANTS

### A. The Parties

#### 1. Raflatac

22. Raflatac, a wholly-owned subsidiary of UPM-Kymmene Oyj ("UPM"), is a producer of labelstock. (DX 2262 (Harris Rep.) at ¶ 15). UPM produces label papers for sale to both Raflatac and other labelstock producers. (Niemela Tr. 1347:11-12; 1350:21-24).

#### 2. MACtac

23. MACtac, a wholly owned subsidiary of Bemis, produces and markets pressure-sensitive labelstock. (DX 1468 at 2-6; DX 1465 at 7). In the United States, MACtac owns and operates labelstock production facilities in Pennsylvania, Nevada, Indiana, and Ohio. (DX 1465 at 2-6, 43).

24. MACtac produces and sells a wide range of paper and film labelstock products. (Madel Tr. 837:16 - 828:3).

### B. Manufacturers of pressure-sensitive labelstock

#### 1. Avery Dennison

25. Avery Dennison Corporation ("Avery Dennison") is the largest pressure-sensitive labelstock manufacturer in North America. (GX 385 (Schwartz Rep.) at Table 1). Avery Dennison's pressure-sensitive labelstock business is known as Fasson. Avery Dennison's headquarters is located in Pasadena, California. (DX 1548 at 2, 5).

26. Avery Dennison's 2002 sales exceeded $4.2 billion. (DX 1548 at 11; Schwartz Rep. at 5). Worldwide sales of its Pressure-sensitive Adhesives & Materials segment totaled $2.6 billion in 2002. Avery Dennison is publicly traded. (DX 1548 at 14).

27. Avery Dennison also sells to retailers its Avery Dennison brand pressure-sensitive labels. (DX 1548 at 3).

### 2. Green Bay Packaging

28. Green Bay Packaging, Inc. ("Green Bay") is a privately held corporation headquartered in Green Bay, Wisconsin. (DX 2092 (Wilcox Decl. 5/6/03, ¶ 2)).

29. *In [TRADE SECRET UNDER SEAL], Green Bay sold approximately [TRADE SECRET UNDER SEAL].*

### 3. Technicote

30. Technicote, Inc. ("Technicote") was formed in 1980 as a roll label pressure-sensitive manufacturer supplying label materials to label converters who print labels for various industries. It is a privately held company headquartered in Cuyahoga Falls, Ohio. (DX 2188 (Stover Dep. 13:19-14:1)).

31. *In [TRADE SECRET UNDER SEAL], Technicote sold approximately [TRADE SECRET UNDER SEAL].*

### 4. Acucote

32. Acucote, Inc. ("Acucote") was founded in 1987 in Graham, North Carolina. (Crutchfield (II) Dep. 5:4-5, 5:19-6:4). *[TRADE SECRET UNDER SEAL].* Acucote leased its facilities in 1987, when it began manufacturing labelstock. (Crutchfield Dep. (II) 5:16-6:13).

6

33. John Leath is the CEO *[TRADE SECRET UNDER SEAL]* of Acucote. (Crutchfield (II) Dep. 156:9-10.)

34. *Acucote's net sales in [TRADE SECRET UNDER SEAL] were approximately [TRADE SECRET UNDER SEAL]. Acucote's sales are split [TRADE SECRET UNDER SEAL].*

### 5. Spinnaker

35. Spinnaker Coating LLC ("Spinnaker") is a manufacturer of pressure-sensitive labelstock headquartered in Troy, Ohio. (Guzzetti Dep. 18:3-17). Spinnaker sells both paper prime labelstock and paper variable information printing labelstock. (Guzzetti Dep. 28:9-29:13).

36. Spinnaker has a production facility in Ohio and distribution centers in Wisconsin, Massachusetts, North Carolina and Texas. (Guzzetti Dep. 264: 19-25).

37. Spinnaker reports its data to the Tag and Label Manufacturers Institute ("TLMI"), a trade association. (Guzzetti Dep. 44:20-45:4).

### 6. Wausau Coated Products

38. Wausau Coated Products, Inc. ("Wausau"), headquartered in Wausau, Wisconsin, is a manufacturer of pressure-sensitive products. (DX 2096 (Reif Decl. 5/6/03, at ¶ 1)).

39. Wausau offers pressure-sensitive labelstock used for various methods of web printing and a variety of on-demand printing methods, including direct thermal, thermal transfer and laser/ink jet technologies. Wausau participates in the manufacture of film and paper pressure-sensitive labelstock for prime, VIP, and other end uses. (DX 2096 (Reif Decl. 5/6/03, at ¶ 2)).

40. Wausau provides data to TLMI. (Reif Dep. 193:18-194:11).

### 7. FLEXcon

41. FLEXcon Corporation ("FLEXcon") is primarily a manufacturer and distributor of pressure-sensitive film labelstock. (McDonough Tr. 388:8-18; McDonough Dep. 17:10-17; 81:5-16; 192:13-14). FLEXcon also manufactures a pressure-sensitive labelstock product which is converted into self-adhesive stamps for the United States Postal Service. (McDonough Tr. 394:11-24; Lipinski Tr. 293:5-22).

42. A privately held company, FLEXcon is based in Spencer, Massachusetts, where it has a manufacturing facility. (McDonough Tr. 386:15-20; 387:25; 388:1-3; McDonough Dep. 8:10-15). In addition to its Spencer facility, FLEXcon has two additional facilities, located in Columbus, Nebraska and Fridley, Minnesota. (McDonough Tr. 387:25; 388:3; 414:11-13; McDonough Dep. 8:19-22; 9:1-2, 9-11).

43. ***FLEXcon's total revenues for 2002 were approximately [TRADE SECRET UNDER SEAL].***

### 8. Ricoh

44. Ricoh Electronics, Inc. ("Ricoh") is a global manufacturer of office automation equipment. (DX 1589). Ricoh had 2002 annual sales of $12.5 billion. (DX 1589).

45. Ricoh's Thermal Media Group engages in the sale of pressure-sensitive direct thermal rollstock and tag and thermal transfer ribbon. (Fickenscher Dep. 5:6-9).

46. Ricoh's Thermal Media Group has its offices in Santa Ana, California. (Fickenscher Dep. 4:19-22).

47. Ricoh is a vertically integrated company that develops electronic printing equipment and the thermal paper to be used by such equipment. (DX 1589).

### 9. Ritrama

48. Ritrama, Inc. ("Ritrama") is a pressure-sensitive labelstock manufacturer with plants in the United States. (GX 332 (Hanzal Decl. 1/14/03, ¶1)). Ritrama produces pressure-sensitive labelstock with film-based face stock. (GX 332 (Hanzal Decl. 1/14/03, ¶1)). *In [TRADE SECRET UNDER SEAL], Ritrama had North America revenues of [TRADE SECRET UNDER SEAL].*

49. Ritrama is owned by Ritrama Holdings, Inc., which is partially owned by Ritrama SPA, an Italian Corporation which manufactures both film and paper labelstock. (GX 332 (Hanzal Decl. 1/14/03, ¶2)).

50. Customers buy Ritrama's film labelstock and use it in applications such as shampoo bottle labels. (GX 332 (Hanzal Decl. 1/14/03, ¶3)).

### 10. 3 Sigma

51. 3 Sigma Corporation ("3 Sigma") is located in Troy, Ohio and is a producer of pressure-sensitive labelstock. (DX 2091). *3 Sigma supplies labelstock [TRADE SECRET UNDER SEAL]. 3 Sigma can manufacture [TRADE SECRET UNDER SEAL].*

## III. COMPETITION

52. Today, the paper label industry is highly competitive. (Pagel Tr. 222:4-5).

53. Paper label buyers use multiple suppliers to keep the market honest. (Hakman Tr. 166:3-6; Pagel Tr. 222:25-226:2).

## IV.  ENTRY

54.  New coating machines are available from a number of equipment manufacturers, including Bachofen + Meier (DX 2165 (Meier Decl. 5/13/03, at ¶ 2-3)); Black Clawsen (DX 2053 (Panozzo Decl. 3/28/03, at ¶ 2)); Faustel (DX 2167 (Hartley Decl. 5/16/03, at ¶ 2)); Dri-Tec (DX 2959 (Gaspardo Decl. 5/7/03, at ¶ 2)).

55.  The width of coating machines used to manufacture labelstock in North America ranges up to ninety inches.  (DX 2165 (Meier Decl. 5/13/03, at ¶ 2); (DX 2053 (Panozzo Decl. 3/28/03, at ¶ 3)); Faustel (DX 2167 (Hartley Decl. 5/16/03, at ¶ 3)); Dri-Tec (DX 2959 (Gaspardo Decl. 5/7/03, at ¶ 3)).

56.  Used coaters are also available from used equipment resellers, such as, for example, Margot Machinery.  (DX 2166 (Ellett Decl. 5/14/03, at ¶3)).

57.  Used coater resellers, including Margot Machinery, Flex-O Technology, QAM Graphic Systems, Dean Machinery, Gibbs Brower International and Global Equipment & Machinery Sales, carry in stock a wide range of coating equipment, including coating machines. (DX 1871; DX 1872; DX 1877; DX 1881; DX 1882; DX 1883).

## V.  PRICES HAVE BEEN DECLINING

58.  The entry of Raflatac into the United States contributed to historically low prices and significant erosion in profitability among labelstock suppliers.  (PI Motion at 12).

59.  The prices for labelstock "declined across the market in 2001." (PI Motion at 12).

## VI.  TAG AND LABEL MANUFACTURERS INSTITUTE

60.  The trade association for PSL manufacturers is the Tag and Label Manufacturers Institute, Inc. ("TLMI"). TLMI obtains sales data from reporting members on a quarterly basis for

15 categories of pressure-sensitive labelstock products (the "TLMI categories") broken into four groups. (DX 2169 (Sablone Decl. 5/15/2003, ¶ 6)). The categories were established by a TLMI committee composed of PSL manufacturers several years ago and have not changed significantly over time. (DX 2169 (Sablone Decl. 5/15/2003, ¶ 7)); (GX 378 (Sablone Decl., 5/22/2003, ¶ 5)). TLMI publishes quarterly the TLMI Rollstock Report, a report on aggregated shipments in MMSI (million square inches) and gross billings (in dollars) for TLMI members that choose to submit such data. Although not all PSL manufacturers submit data for the TLMI Rollstock Report, the following companies currently do submit such data: 3M; 3 Sigma; CCG; Emtech; Avery/Fasson; Flexcon; Green Bay Packaging; MACtac; Ritrama; Spinnaker; UPM/Raflatac; and Wausau Coated Products. (DX 2169 (Sablone Decl. 5/15/2003, ¶ 4-5)); (GX 378 (Sablone Decl., 5/22/2003, Exh. 1 at USDOJ-1195)).

61.     There are 15 TLMI categories. TLMI Category #1 is Standard White Permanent Adhesive. (GX 328 at 8-9).

62.     TLMI Category #2 is Standard White Removable Adhesives. (GX 328 at 8-9).

63.     TLMI Category #3 is Color Paper. (GX 328 at 8-9).

64.     TLMI Category #4 is Specialty Paper. (GX 328 at 8-9).

65.     TLMI Category #5 is Standard Uncoated EDP (Electronic Data Processing) Paper. (GX 328 at 8-9).

66.     TLMI Category #6 is Direct Thermal. (GX 328 at 8-9).

67.     TLMI Category #7 is Thermal Transfer. (GX 328 at 8-9).

68.     TLMI Category #8 is Laser/Ink Jet. (GX 328 at 8-9).

69.     TLMI Category #9 is Foils. (GX 328 at 8-9).

70. TLMI Category #10 is VIP Film. (GX 328 at 8-9).

71 TLMI Category #11 is Over Laminating Film. (GX 328 at 8-9).

72. TLMI Category #12 is White Film. (GX 328 at 8-9).

73. TLMI Category #13 is Clear Film. (GX 328 at 8-9).

74. TLMI Category #14 is All Other Film. (GX 328 at 8-9).

75. TLMI Category #15 is Multipass/Piggyback. (GX 328 at 8-9).

76. TLMI organizes paper labelstock into two broad categories based on how the labelstock is often used: (1) "White, Color, and Specialty Papers" (which DOJ calls "prime" paper labelstock) and (2) "variable information printing" ("VIP") paper labelstock. (DX 2262 (Harris Rep.) at 21).

77. In North America in 2002, about 82 percent by volume of all pressure-sensitive labelstock sold was made with a paper face ("paper labelstock"). (DX 2262 (Harris Rep.) at 22.) Most of the rest (16%) was made with a film (or plastic) face ("film labelstock"). (DX 2262 (Harris Rep.) at 22). The remainder (less than 2%) was accounted for by labelstock with a foil (metallic) face or a multiple layer construction called multipass/piggyback. (DX 2262 (Harris Rep.) at 22).

## 2.

The following recitations include findings of fact and conclusions of law.

A. The Government Perspective

There are reasons to believe that the purchase of MACtac will have an anti-competitive effect on prices of label stock.

UPM is a supplier of paper to Avery, *[TRADE SECRET UNDER SEAL]*. Avery would prefer not to face price competition from UPM/Raflatac. UPM would like Avery to continue buying its paper in quantities which equal or exceed its highest past level. If Raflatac buys MACtac, it buys market share and the capacity to produce more and much more varied products than it currently has. This increases UPM's leverage over Avery, but it does not eliminate Avery's leverage over it.

The business plan of Raflatac is to secure about 20% of the market for the sales of its products. It does not view Avery as its principal competitor. Rather, it wants to take business away from current Avery competitors—in other words, to be a good "second alternative" to other second tier suppliers. It is clear that Avery is strong enough to take any business it wishes to have, and the evidence supports the view that the entire second tier of suppliers tries to limit the number of occasions on which it competes with Avery. With the purchase of MACtac, Raflatac will have reached its plan goal and will have no particular incentive to go after Avery at least for a while.[1] To this state of affairs must be added the disincentive of going after a large customer of the parent UPM. By selling to the MACtac customers, Raflatac would be dealing with those who had not been buying their product from Avery.

The price of what Raflatac and Avery sell has steadily declined over the years and, like every business everywhere, management of all companies in the business would like to see higher profit margins. There is particular concern over breaching the 20¢ per msi (thousand square inches) level. MACtac has a lot of excess capacity, and excess production capacity in the hands of

---

[1] Although the government does not explicitly argue this, I construe their position to be based on the phenomenon that bureaucratic rewards generally flow to those who meet their stated goals and rarely flow to those who strive for places beyond the stated goals and fail to reach them.

a rival is always a threat to a producer that wishes to raise its prices. If Raflatac controls that excess capacity, it takes the capacity out of the equation by which prices are determined. If there is not much excess capacity and two suppliers sell 70% of the product, it may have the ability to raise prices and make its raise stick. The past history of the industry shows that announced price rises have been withdrawn in the face of competition. *[TRADE SECRET UNDER SEAL]*.


## B. Defendants' Perspective

However, there are also reasons to believe that the deal will not have any anti-competitive effects.

MACtac is an ineffective competitor. Its sales have been going down consistently and this trend has reversed itself only very recently. Its parent does not like its return on investment in MACtac, which is much lower than its return on its other operations. Therefore, its parent is limiting new investment in the company to the bare minimums. In fact, not long ago, MACtac's parent was offered substantially more than the current sale price by UPM and refused it. Now they are willing to accept less than half that price.

UPM is historically (and, I think they mean to say, culturally) an aggressive competitor. It is the reason Avery took note of Raflatac in the first place. It lowered prices below Avery's quotes to customers by 10% or more.

The relationship of supplier-customer has not, historically, necessarily lessened competition and there are examples of this. UPM itself builds a Chinese Wall so that those who sell to Avery have no influence over Raflatac and vice-versa. The policy of UPM is to sell its label stock to Avery on exactly the same terms it sells it to its subsidiary Raflatac–both arms length transactions. This was the assurance given to Avery when it complained about Raflatac's competition: an

14

assurance that UPM would not advantage Raflatac in its purchase of supplies and not an assurance that the "unadvantaged" Raflatac would not compete for business.

The times when Raflatac refused to lower its prices below a certain point were due to the fact that it had reached its cost. On other occasions it broke the 20¢ barrier.

There are substantial suppliers other than Avery, MACtac and Raflatac. There are vigorous competitors that have the capacity to supply product to those turned off by a price increase. While MACtac does have substantial excess capacity, so too do those other suppliers.

There are other barriers to effective price increases by Avery and an enlarged Raflatac. Pricing is not transparent, all deals are negotiated, and price breaks are given or refused without a lot of publicity. Some undercutting can occur without detection. Moreover, when prices go too high, some customers have said they will buy or use their own coating machines and bypass their suppliers entirely. They would also be able to bypass the products themselves. If paper labels become too costly, the ultimate consumer- the customers of the converter—could use film labels, glued paper labels and, in the case of VIP labels, no label at all (the information can be printed directly on the product, e.g., the subscriber label on the cover of a magazine). Indeed, for this reason and others, the product market seems to be poorly defined by the Government.

# 3.

## **Further Findings of Fact and Conclusions of Law**

15

Few of these reasons are makeweights[2] and, as I construe the law, I have to decide which are the better reasons in order to conclude whether the acquisition would probably substantially lessen competition or would probably not.

The market definition here is not a model of logic. Its limits are vague and it includes two quite different products, both of which are manufactured by the same producers. But market definitions are rarely perfect. *See United States v. Rockford Memorial Corporation*, 898 F. 2d 1278, 1285 (7th Cir. 1990) ("It is always possible to take pot shots at a market definition"). However, the defined market (or two separate markets) of Bulk VIP Prime and Bulk Prime PSL are adequate for antitrust purposes. I think the product-market methodology set out in the Horizontal Merger Guidelines is legally sound. I agree that some functional substitutability between products is not itself enough to place those products in the same product market for antitrust purposes. If, despite this functional substitutability, buyers of one product would not switch to the other product in numbers sufficient to defeat the profitability of a small but significant, non-transitory price increase, then those functionally similar products are not in the same market. *See United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir, 1988). Although defendants have shown that customers could and might use products that are functionally similar to paper labels, there has not been a showing that this would occur enough to defeat the

---

[2] I do not regard some of the arguments as helpful to the parties. It is true that the wider, high speed coaters are largely in the hands of Avery, MACtac and Raflatac, but I am not convinced that narrower and lower-speed coaters cannot compete. In some respects the older coaters are easier to operate, and comparative costs of operating the machinery (i.e., labor costs and power requirements which may differ among the various competitors), have not been provided to me. I give no weight to the fact that some competitors have bigger coaters except to infer that the purchase of newer coaters by the parties and by Avery evince their desire—whether in collusion or honestly—to acquire more market share. But this proposition is not in dispute.

profitability of a small, but significant, non-transitory price increase by Avery or an enlarged Raflatac. Thus, while the Government's product market analysis does not take functional substitutes to paper labels into account as much as it might and should have, that market definition is still adequate under antitrust law.

MACtac, like Raflatac, treats Avery with deference within the product market. It has no desire to go head to head with Avery unless the customer is dissatisfied with Avery's performance. This is true, to some extent, of every supplier in the business. It is true because (1) Avery, with its quality products and huge size, has the power to retaliate against competitors; (2) it is hard to take away a satisfied customer from anyone; and (3) Avery might be content to lose a customer who is difficult to please. This common attitude speaks well for the integration of MACtac and Raflatac, but presents difficulty for the consumer. The post-acquisition Raflatac/MACtac (which I shall denote as "Raflatac 2nd") would, according to its own plans, compete largely against the suppliers in the half of the market that Avery does not have. By virtue of its size it could more effectively compete against Avery.

The central question in this case, as I see it, is whether Raflatac 2nd will compete against Avery. My conclusion is that the substantial probability is that it will not do so for a significant period of time.

The interests of Raflatac 2nd would be best served by maintaining price stability. Everyone in the business seems to believe that prices have become quite low, with profit margins that have continually declined. Moreover, the parent of Raflatac 2nd can use the threat of increased competition to leverage Avery into larger purchases of its label stock. Since UPM makes good label stock, these purchases would not inflict harm on Avery so long as the price it pays is no

17

greater than the price Raflatac 2nd pays for the same material from its parent. And UPM has offered an effective way for Avery to determine whether it is being overcharged. Vigorous competition is unlikely.

Lastly, MACtac is, according to everyone, a company that is troubled. The best the Government can say of MACtac is that it is improving in the last few months. But MACtac is not what it once was, and its operations must be put into order. This cannot, I think, be done overnight. It does not make much sense for Raflatac 2nd to fight with Avery. A period of peaceful coexistence serves the interest of Raflatac 2nd, its parent UPM, and Avery. In this sense, the weakness of MACtac does not work against the government's position, as both sides contend.

But what is good for these companies is not necessarily what they can achieve because they are not alone in the market. There is one competitor–Green Bay–which has about a 10% share of sales of the products at issue here. *[TRADE SECRET UNDER SEAL]*. Green Bay could keep its customers and charge what Avery and Raflatac 2nd charge and make more money than they have recently. The remaining competitors all with small market shares have an incentive to go along with price increases. None of them can realistically expect to take significant shares of business from the giants at least one of whom–Avery–seems to be an unforgiving enterprise.

Indeed, when 80% of current production is in the hands of three companies who agree to raised prices, they will be able to do so with little fear that the fringe of other competitors can defeat their attempts at price increases because those fringe competitors will be unable to expand their own output to serve the customers of the giants. For example: to take away 20% of Raflatac's, Green Bay's, and Avery's customers, thus reducing their market share from 80% to 64%, the fringe competitors would have to increase their own output by 80% (from 20% to 36% of the market). This would undoubtedly take time and raise their costs, likely so drastically that their

18

small size would prevent them from surviving such raised costs. Thus, Raflatac, Green Bay, and Avery could raise prices within a reasonable limit and avoid transaction costs and risks of exposure that might result from trying to coordinate with smaller competitors. *See Rockford*, 989 F.2d at 1283-84.

There are other ways to label products, and business could be lost to film, but price increases of the order of 5-10% would not lead to much transfer to film. Some of the converters could coat their own papers, and some do, but I find that converters would be slow to move to self-coating. If label stock prices increase relatively uniformly, converters have the ability to resist downward pressure on the prices they charge their customers.

Defendants' arguments about the existence of counterweights to anti-competitiveness are not without considerable force. But they serve to prove only that an Avery and Raflatac 2nd cannot maintain minimum prices forever, or even for very long. Perhaps Avery and Raflatac 2nd would have to yield after a year or two. Green Bay may become ambitious for larger market share after a while. Converters may start coating and end users may change their labeling practices. But there is no evidence that this will occur quickly and what evidence there is shows that normal inertia aside (and I do not put it aside), nearly everyone in the business would like a rest from competitive pressures on their prices.

The best evidence for allowing the merger to go forward is that offered about the character of the CEO of UPM, Juha Niemela. *[TRADE SECRET UNDER SEAL]*. And, on the witness stand, Niemela gave the impression of a very tough, highly competitive person which, I find, he is. I am less inclined to give much weight to the Avery testimony. If this merger is good for Avery, I would suspect the last impression that it would like to leave is that Niemela is a very cooperative

19

fellow. Indeed, the early notes made by Avery people expressed the view that Niemela would try *[TRADE SECRET UNDER SEAL]*.

Niemela is a competitive person, but the fact remains that his business interests are best served by a significant period of lessened competition. So I am left with the conclusion that Niemela may try to annihilate Avery, but he will not start or be forced to start for a significant period of time.

I believe, therefore, that the merger is quite likely have anti-competitive effects for a significant period of time, at least, in my view, for a year.

Defendants argue, in the alternative, that it is not the merger which will cause anti-competitive effects. It is, instead, the decision of the owners of MACtac to let it run down. The owners have stated that they are displeased with the return on investment from its operations as compared to the return it derives from its other operations. Being deprived of capital support from its parent, MACtac will be able to maintain its existing clients for a time, but will not compete for new business. Entropy will eventually shrink the firm, and someday MACtac will start selling off its coaters and eventually close its doors unless, of course, some highly competent and charismatic executive can bring it back to life. I am satisfied that for the period of anti-competitive conduct by Avery and Raflatac 2nd, MACtac could, if unsold, be an effective competitor. And there seems to be no other likely purchaser of MACtac except perhaps Green Bay, which is not eager to go to war against Avery or anyone else for that matter except on the smallest scale. The implicit defense argument here is that if Avery and Raflatac decide to try to hold to minimum pricing, MACtac will go along since it has no desire to compete and, like Green Bay, would welcome the higher prices.

This "weakened-competitor" argument is distinct from a "failing company defense," which the Government points out. The Government also points out that defendants cannot meet the elements of a failing firm or failing division defense. In response, defendants reiterate that they are alleging neither a failing firm nor a failing division defense, but assert that while there is no precise doctrine which allows acquisition of an "underfunded and ineffective company," I am authorized to consider the weakness of competitors, namely MACtac's weakened and declining competitiveness. *See, e.g., United States v. Baker Hughes, Inc.*, 908 F.2d 981, 985 (D.C. Cir. 1990); *Lektro-Vend Co. v. Vendo Co.*, 660 F.2d 255, 276 (7th Cir. 1981). While the Government does not dispute that a "weakened-competitor" argument is recognized, it argues that the Seventh Circuit, although allowing the argument to be a consideration, explicitly states that it "certainly cannot be the primary justification" for permitting a merger. *Kaiser Aluminum & Chemical Corp. v. Federal Trade Commission*, 652 F.2d 1324, 1341 (7th Cir. 1981). The Government, citing case law from other circuits and this district, also argues that the "weakened-competitor" argument should not vitiate the standards for the failing firm or failing division defense. However, defendants are quick to remind the Government that they are not relying on a failing firm or failing division defense. Although I tend to agree with the Government's assessment of the law, that is not relevant to this inquiry. What is relevant is whether I should consider MACtac's weakened and declining competitiveness and if so, how much weight that consideration should be given.

The idea that I may consider the weakness of a competitor makes sense in the abstract, but the application of the doctrine in the present case is not particularly attractive. It is one of the defendants that has decided to make its subsidiary into an ineffective competitor. In the cited cases dealing with "failing companies," the reasons the company is failing or ineffective are found in economic conditions or management errors made in the good faith attempt to do well. Here,

21

MACtac is viable, and it is non-competitive simply because its parent has decided not to compete. To allow such conduct to be used to justify an otherwise anti-competitive merger seems to be bad policy. On the other hand, there are reasons to believe that few companies would manipulate their subsidiaries in this way, particularly publicly held companies that must defend their actions to their shareholders and, perhaps more realistically, to lawyers who make a living out of representing disgruntled shareholders. There is no particular ground to believe that Bemis has deliberately diminished MACtac's capacity in order to create a defense to a suit to prevent its selling it to UPM.[3]

But what if the sale does not go through? The same incentive that makes it difficult for publicly held companies to weaken subsidiaries for the sole purpose of avoiding antitrust objections to the sale of the subsidiary also makes it difficult for Bemis to carry out its "slow but profitable" planned demise of MACtac. MACtac makes money and, if Bemis cannot get its capital out of the subsidiary because the antitrust laws stop it from selling the company, its management will have to change course or face challenges from its owners. The changes in course are to enable it to compete or to sell off its equipment and its customer accounts, perhaps in pieces smaller than the whole. I do not believe that Bemis's management is untruthful when it says what it will do with MACtac if the deal does not go through. The Government is skeptical, but I believe that Bemis is truthfully speaking about its plans. What I do not believe is that they can carry them out.

Even if they do carry them out, the result is still better than the one I foresee if the merger goes through. Raflatac will have to compete if it does not want to abandon its investment. UPM

---

[3] A short time ago Bemis could have sold MACtac for more than twice the amount it now seeks but did not do so. Also, it has acquired equipment and built plants, so I am inclined to believe Bemis sought to make a go of MACtac and came to the conclusion that it was not worth its while to do so.

will not have the leverage to force Avery to buy *[TRADE SECRET UNDER SEAL]* paper

*[TRADE SECRET UNDER SEAL]* and, without that leverage, no reason not to compete. The

original reaction of some converters to welcome the merger resulted from their impression that

Raflatac 2nd, with its market and very large parent company, would be a worthy competitor to

Avery. While my decision will preclude Raflatac from buying market share, the fact remains that

its parent has the capital to compete with Avery. Apart from the market share it wishes to buy

from Raflatac, the equipment it needs to broaden its product line is available for purchase from a

wide variety of companies.

If one takes the longest view, Raflatac 2nd and Avery will eventually go head to head on

prices and if they don't, their customers will go to other products or other ways of obtaining what

they now buy from these suppliers and Green Bay will eat into their customer base. But this will

not, I find, happen for at least a year, and antitrust law does not permit this period of anti-

competitive conduct simply because competition will return after it is over.


## 4.

### Conclusion

To obtain a preliminary injunction, the Government must first "meet the threshold burden

of establishing (1) some likelihood of prevailing on the merits; and (2) that in the absence of the

injunction, [it] will suffer irreparable harm for which there is no adequate remedy at law."

*AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573 (7th Cir. 1999). If these requirements

are met, I must apply "a 'sliding scale' analysis by balancing the harms to the parties and the public interest." *Id.* In balancing the harms, I must also take into account the Government's likelihood of success. *Federal Trade Commission v. Elders Grain, Inc.*, 868 F.2d 901, 903 (7th Cir. 1989) ("The greater the plaintiff's likelihood of success on the merits when those merits are ultimately determined after a full trial . . . the less harm from denial of the preliminary injunction the plaintiff need to show in relation to the harm that the defendant will suffer if the preliminary injunction is granted.").

Section 7 of the Clayton Act prohibits acquisitions that may substantially lessen competition. An acquisition is illegal "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. There are three basic steps in analyzing a merger–determination of (1) the "line of commerce"–usually referred to as a product market–for assessing the transaction; (2) the "section of the country"–or geographic market–for assessing the transaction; and (3) whether the proposed transaction may substantially lessen competition in that defined product and geographic market, often referred to as the "relevant market." *United States v. Marine Bancorp*, 418 U.S. 602, 618-23 (1974). In challenging a merger, "[a]ll that is necessary is that the merger create an appreciable danger of such consequences in the future. A predictive judgment, necessarily probabilistic and judgmental rather than demonstrative is called for." *Hospital Corp. of America v. Federal Trade Commission*, 807 F.2d 1381, 1389 (7th Cir. 1986).

I find it probable that price competition will be diminished if the merger goes forward. Consumers of the products will be damaged by paying more than they otherwise would pay. The Government has proved that its likelihood of success on this point is high. Indeed, it is not quite

24

clear if there is any other evidence to be heard on the question and, absent such evidence, the contention is proved. The intended purpose of federal antitrust laws is to be a "consumer welfare prescription." *NCAA v. Bd. of Regents of Univ. of Okl.*, 468 U.S. 85, 107 (1984) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979)). The government has sufficiently shown that this purpose of federal antitrust law will be served by granting the injunction.

The balance of harms, which is a question I am not required to consider given my view of the merits, is nonetheless a factor which favors the government. A wrongful denial of injunction would, for a year or more, inflict irreparable damage on consumers and, in all probability, leave us with a Raflatac 2nd that could not be divided back into the entities from which it was formed. A wrongful grant of injunction leaves Raflatac no worse off than it is now. Instead of buying market share, they can earn it in the customary way. MACtac's declining condition will either be reversed or its slack will be taken up by other producers–the existing price competition will be diminished little or not at all. I find the public interest in having competitive markets is served by preventing the merger.

Although "[i]t is regrettable that antitrust cases are decided on the basis of theoretical guesses as to what particular market-structure characteristics portend for competition, . . . to place on the government an insuperable burden of proof is not the answer." *Rockford*, 898 F.2d at 1286. "The principles of civil procedure do not require that the plaintiff make an airtight case, only that his case satisfy some minimum threshold of persuasiveness and be better than the defendant's case." *Id.* I find that the government has met this "minimum threshold."

Therefore, I enjoin the proposed merger as violative of the Clayton Act.

It is so ordered.[4]

ENTER:

_James B. Zagel_
James B. Zagel
United States District Judge

DATE:

25 July 2003

---

[4] In this opinion I have, in part, scrambled conclusions of law and findings of fact. While this is generally discouraged, I am permitted to do so, as long as the findings are adequate. *See Koehler v. United States*, 200 F.2d 588. 592 (7th Cir. 1953). Ordinarily, I would not do this, but there is a significant degree of urgency in the need of the parties for a decision, and I thought it prudent to issue my ruling without parsing out findings from conclusions.